IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **JEREMY SCOTT CARTER,** | ) | Civil Action No. 7:10-cv-00342 |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **GENE M. JOHNSON, et al.,** | ) | By:   Hon. Michael F. Urbanski |
|     **Defendants.** | ) |         United States District Judge |

Jeremy Scott Carter, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Carter names as defendants in both individual and official capacities: Gene M. Johnson, former Director of the Virginia Department of Corrections ("VDOC"); Randal C. Mathena, former Warden of the Keen Mountain Correctional Center ("KMCC"); Jeffrey Kiser, former KMCC Assistant Warden; Major E. Newberry, former KMCC Chief of Security; Sergeant F. Bailey, the KMCC Institutional Gang and Security Threat Group Investigator; KMCC Correctional Officers Matthew Belcher, Captain R. Wicks, Lieutenant J. Honaker, Sergeant J. Davidson, and Sgt. J. Looney; and former KMCC Correctional Officers Sergeant Tammy Mitchem and Sergeant G. Horn. Carter alleges that defendants failed to protect him from another inmate's violent attack, in violation of the Eighth Amendment. Defendants filed a motion for summary judgment, arguing that Carter failed to state a claim and that they are entitled to qualified immunity.[1] Carter filed a cross motion for summary judgment, arguing that Looney's and Belcher's failure to stop the attack warrants an immediate award of damages. After reviewing the record from the requisite perspectives, the court finds that a jury must resolve disputes of material facts about

---

[1] By Memorandum Opinion and Order dated May 27, 2011, the court rejected defendants' defense of qualified immunity after determining plaintiff "alleged sufficient facts . . . to state a constitutional claim which was clearly established. . . ." (ECF no. 66-67 (Wilson, J.))

Mitchem's, Horn's, Davidson's, Honaker's, Looney's, and Belcher's alleged deliberate indifference to Carter's safety, but the court grants defendants' motion for summary judgment for all other claims.

## I.

Carter met Roger Parker in January 2009 while they were both incarcerated at KMCC in C-3.[2] Parker explained he was a Five Percenter,[3] was God incarnate, and could "punish anybody that does wrong."

In mid-February 2009, Carter sat at a dining table where Parker was eating. Parker asked Carter if he had permission to sit there, but Carter rebuffed Parker, saying, "Why? It's not like I'm sitting in the presence of royalty, now is it? Besides, the only open seat in the chow hall was this one."

Parker replied, "Well, technically, you are sitting with royalty."

"And how is that, [Parker]?"

"I'm God, remember? If that's not royalty, I don't know what is."

"[Parker], you're not God."

"Yes, I am!" Parker declared.

"Just how are you God, [Parker]?"

"Because I'm black."

---

[2] KMCC inmates are housed in several buildings, including the "A Building" and "C Building." A housing number denotes a specific pod in a building, and thus, "C-3" refers to pod three in the C Building.

[3] "Five Percenter" is the common label for an adherent of the alleged prison religion "The Nation of Gods and Earths." Several state prison systems have increased supervision of Five Percenters because they "act as an organized group within the prison system to receive new members, intimidate members of rival groups, and participate in criminal activity, including extortion, robbery, assaults and drug trafficking." Lord Natural Self-Allah v. Annucci, No. 97-CV-607(H), 1999 U.S. Dist. LEXIS 7171, at *13, 1999 WL 299310, at *9 (W.D.N.Y. Mar. 25, 1999).

2

Dissatisfied with the response, Carter inquired, "And what does that make all white people?"

"White people are the Devil!"

Carter no longer felt comfortable sitting with Parker and moved to another table. Parker began intently staring at Carter whenever he saw him, which is known as "gritting" on an unliked inmate.

A couple of days later, Carter recited these events to Sgt. Mitchem, the A-Building Sergeant. Carter described the conversation and Parker's "gritting," said he feared for his safety, and asked to be transferred to Sgt. Mitchem's building. Sgt. Mitchem said that no cell was available and, regardless, she could only transfer inmates out of her building, not into them. Sgt. Mitchem told Carter to speak with the C-Building Sergeant.

Despite this advice, Carter approached Sgt. Horn, a "swing sergeant,"[4] in the third week of February. Carter recited his history with Parker to Sgt. Horn, said he feared for his safety, and asked to be transferred from the C Building. Sgt. Horn explained he was a swing sergeant, said he "couldn't do anything" for Carter, and told Carter to speak with the C-Building Sergeant.

Two days later, Carter met with Sgt. Davidson, the C-Building Sergeant, who was accompanied by two other officers Carter did not trust. Instead of talking about being scared of Parker in front of the other officers, Carter told Sgt. Davidson that he wanted a transfer to a smoking pod from his non-smoking pod. Sgt. Davidson told him to promptly file Cell Change Request and Informal Request forms before March 1 because routine cell transfers occur only on the first day of each month.

---

[4] A "swing sergeant" is not assigned to a particular building but works in multiple buildings to cover other sergeants' shifts during breaks.

Carter privately met with Sgt. Davidson a few hours later, recited his history with Parker, said he feared for his safety, and asked to be moved to another building. Sgt. Davidson replied, "Carter, I know you're just making this up. You're a smoker and want to move. You told me so yourself less than an hour ago. You're just desperate to move because you want to smoke a cigarette. Don't lie to me again, or I'll lock you up."

The next day, Carter told Lt. Honaker[5] about his history with Parker, said he feared for his safety, and asked to be moved to another building. Lt. Honaker told Carter to send him an Informal Request and that he would "look into it." Carter sent two Informal Requests to Lt. Honaker on February 27 and March 5, 2009, but Carter never received a response.[6]

During the morning of March 9, 2009, Parker declared to other inmates in C-3 that "he[7] wasn't going 'to be in this pod much longer' while looking at [Carter], sneering." (Am. Compl. ¶ 56.) Carter retreated to his cell and wrote Informal Requests to Warden Mathena and Maj. Newberry.[8] Carter did not describe Parker in the Informal Requests but, instead, discussed a prior issue he had with an inmate in the A Building, hoping to cause Mathena or Maj. Newberry to come to Carter's cell where they could privately discuss Parker. Carter put the Informal Requests in the institutional mailbox while on his way to the dining hall that evening.

Just before Carter reached the juice area in the dining hall, Parker nudged Carter in the ribs and cut in front of him. Carter objected, "You cut me off. I was here first."

---

[5] Honaker's present rank is "Corrections Officer Senior."
[6] Carter attached two Informal Request forms purported to be copies of what he filed, but Honaker avers that he never received them. Carter wrote in the first Informal Requests that he was afraid that "problems and disagreements" with an unnamed inmate would become "more hostile." Carter noted in the second Informal Request that he never received a response to the first Informal Request and that Carter "and another offender are not getting along and he [wa]s giving [Carter] dirty looks and [Carter] [was] afraid he may act on his anger toward [Carter]." (Pl.'s Ex. A-1, A-2 (ECF no. 1-1).)
[7] It is not clear from the Amended Complaint whether "he" refers to Carter or Parker.
[8] Carter states without explanation that he post-dated the Informal Requests as March 10, 2009.

"What?"

Carter repeated his objection and chastised Parker for being disrespectful.

"F*** You!" Parker retorted.

"Whatever," Carter quietly said as Parker walked away. Carter took a juice cup and carried his tray toward a dining table, but Parker intercepted him. Parker smacked the tray out of Carter's hands, and before it hit the ground, Parker raised his hands in the air, yelled, "What the f***'s up then, b****!" and slammed his fists into Carter's face.

Carter awoke in a semi-conscious state on the floor approximately twelve feet from where he stood with Parker. Carter, moaning in pain while a nurse kneeled over him, touched his face only to see his hands covered in blood before he drifted in and out of consciousness. He was in great pain when he arrived at the hospital after Parker caused multiple fractures to Carter's nose, jaw, and eye socket. Hospital staff repaired Carter's face, and Carter returned to KMCC on May 1, 2009. Various KMCC staff, including Belcher, allegedly disrespected Carter with jokes and comments about his injuries.[9]

Carter and defendants disagree about how Officer Belcher and Sgt. Looney[10] responded to the fight. Sgt. Looney, who was standing at the back of the dining hall, and Officer Belcher, who was standing at the front of the dining hall, both aver that they heard what sounded like a

---

[9] Carter also alleges in his chronology of events that, after he returned to KMCC, a non-defendant correctional officer punched him in the stomach because the officer thought Carter balled his fists and was going to attack. The court declines to liberally construe these facts into a claim against a non-defendant. Carter clearly and succinctly describes multiple Eighth Amendment claims against specifically named defendants. Nothing in the Complaint and its multiple amendments indicate that Carter filed this action about that officer's punch, and the court declines to construct such a claim for Carter. See Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) (noting that a court does not act as an inmate's advocate, sua sponte developing statutory and constitutional claims not clearly raised in a complaint). See also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that a district court is not expected to assume the role of advocate for a pro se plaintiff).

[10] Looney's present rank is "Senior Correctional Officer."

"thump" or a "striking" sound. Officer Belcher turned around and saw Carter falling to the ground before he pushed through the crowd of inmates gathering around the fight. Sgt. Looney investigated the sound and saw Officer Belcher calling for help on his radio before they approached the fight and yelled at Parker to stop.[11] Parker immediately stood up and put his hands behind his back, and Sgt. Looney handcuffed and escorted Parker from the dining hall. Officer Belcher saw Parker strike Carter three times.

Carter filed affidavits of inmates who were in the dining hall during the fight and completely contradict Looney's and Belcher's versions of events. Inmate Grant says he and Sgt. Looney were talking in the dining hall when they heard a loud noise, like a meal tray hitting the ground. Grant looked around and saw Parker punch Carter in the face, Carter fall toward the ground, and Parker get on top of Carter and beat him. Five seconds passed between Grant seeing the fight and moving to the fight's location, during which he saw "Sgt. Looney walk[] toward the fight and watch[] in total shock as . . . Parker continuously struck . . . Carter in the face and head with his fists[12] . . . . Sgt. Looney fumbled for his radio[] but never actually called for help until the whole ordeal was over. . . . Sgt. Looney never pulled the mace canister from his waist belt, nor did he ever attempt to physically intervene any further assault . . . all while many inmates yelled at Sgt. Looney to stop [Parker]." (Grant Aff. (ECF no. 1-3) ¶¶ 11-13.) Grant says he saw Belcher leave the dining hall until Capt. Wicks and medical personnel arrived, which caused Parker to stop punching Carter, stand up, and voluntarily submit to handcuffs. (Id. ¶¶ 14-15.)

Inmate Raiford testifies that he heard a noise and yelling in the dining hall, saw Parker punching Carter, and saw Officer Belcher leave the dining hall. Raiford also saw Sgt. Looney

---

[11] Belcher does not aver that he used his radio and merely states that security personnel arrived from outside the building.
[12] There is no other evidence in the record to determine how long Parker beat Carter.

watch the fight until Parker stood up when Capt. Wicks and medical staff arrived.  Raiford did not see Sgt. Looney call for help over the radio, and Sgt. Looney later told Raiford that he did not intervene because, "I'm not gonna [sic] put myself into something like that!"  (Raiford Aff. (ECF no. 1-3) ¶¶ 9-15.)  Inmate Hunter similarly avers that he did not see Sgt. Looney or Officer Belcher try to stop the attack.  Hunter explains that Sgt. Looney stood by and watched the whole attack and that Parker ceased the attack only when Capt. Wicks arrived and said, "Carter had[] []had [sic] enough, get off of him."  (Hunter Aff. (ECF no. 1-3) ¶ 13.)

Inmate Ledford testifies that just before he entered the dining hall, he heard a "commotion" and saw inmates gathering in a group as the fight began.  Ledford walked into the dining hall but was stopped by an officer, who was not aware of the fight.[13]  Ledford heard a call for medical assistance come from the officer's radio, and a nurse entered the dining hall a few minutes later.  Ledford did not hear another radio call about the fight.

## II.

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners."  Farmer v. Brennan, 511 U.S. 825, 833 (1994).  To establish a § 1983 claim for a failure to protect an inmate from violence, the inmate must show: (1) serious or significant physical or emotional injury, and (2) that a prison official had a "sufficiently culpable state of mind."[14]  Id. at 834 (internal quotation marks omitted).  A "sufficiently culpable state of mind" means that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

---

[13] Ledford does not identify the officer.

[14] Carter's broken nose, jaw, and eye socket are "sufficiently serious" to survive summary judgment.  See, e. g., Case v. Ahitow, 301 F.3d 605, 606 (7th Cir. 2002) (finding serious physical injuries caused by an inmate's violent assault were "sufficiently serious" under the Eighth Amendment).

7

must also draw the inference." Id. at 837.  This standard can be met by showing that a prison official knew that a particular inmate posed a heightened risk of assault to the plaintiff.  Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000).  Prison officials are not liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Farmer, 511 U.S. at 844.  Prison officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id.

    A.    CARTER FAILS TO ESTABLISH THAT JOHNSON, MATHENA, KISER, NEWBERRY, WICKS, OR BAILEY WAS DELIBERATELY INDIFFERENT FOR NOT SEGREGATING FIVE PERCENTERS.

Carter relies on In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999), to argue that Johnson knew Five Percenters, like Parker, are violent prison-gang members known to attack other inmates.  That case developed because the South Carolina Department of Corrections ("SCDOC") designated Five Percenters as a "security threat group" and transferred them to maximum custody confinement or administrative segregation.  The Fourth Circuit Court of Appeals held that SCDOC's policy of confining all Five Percenters in restrictive confinement did not violate the Five Percenters' civil rights.

Carter acknowledges that Johnson had also designated Five Percenters as a "security threat group" but argues that Johnson's failure to promulgate a similar policy to have all Five Percenters, like Parker, in administrative segregation constitutes a knowing and callous disregard of Carter's safety.  Carter similarly accuses Mathena, Kiser, Newberry, Wicks, and Bailey of failing to house KMCC's Five Percenters, like Parker, in administrative segregation.

However, Carter does not describe any relationship between Five Percenters' gang activities with Carter's interpersonal conflict with Parker. The record indicates that Carter and Parker's relationship soured after Carter questioned Parker's religious beliefs and Parker cut Carter in line. Carter does not establish that Five Percenter violence on unaffiliated inmates, like Carter, is pervasive, or even exists, in the VDOC or KMCC so that a failure to keep all Five Percenters in administrative segregation equals deliberate indifference. See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (holding that supervisory liability requires a supervisor's actual or constructive knowledge of a pervasive and unreasonable risk of constitutional injury to people like the plaintiff); Slakan v. Porter, 737 F.2d 368, 373-74 (4th Cir. 1984) (noting that a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread). The fact that KMCC houses men with violent natures is not a basis to establish a pervasive or unreasonable risk of a violent act occurring. See, e.g., James v. Milwaukee Cnty., 956 F.2d 696, 701 (7th Cir. 1992). Therefore, Carter cannot sustain supervisory liability claims against Johnson, Mathena, Kiser, Newberry, Wicks, or Bailey because he does support his conclusion of widespread Five Percenter violence.

Furthermore, KMCC does not have the resources to enact Carter's preference of indefinitely housing all Five Percenters in administrative segregation. Bailey explains that 200 of the approximately 900 inmates at KMCC are affiliated with a gang and that KMCC does not have the space to segregate gang members.[15] Instead, Mathena explains that the VDOC offender classification system considers each individual inmate's personal conduct, not simply gang affiliation, to assess that inmate's need for supervision. Bailey avers that Parker generally was not a problem at KMCC until he attacked Carter. VDOC officials reviewed Parker's housing

---

[15] Bailey was responsible as the KMCC Intelligence Officer for identifying and monitoring KMCC's gang members.

and security classification after the attack and, per policy, transferred Parker to a more secure prison. However, Carter does not establish that Parker committed any prior violent act in prison that Johnson, Mathena, Kiser, Newberry, Wicks, or Bailey knew about but disregarded to constitute deliberate indifference to Parker's violent nature. Accordingly, these defendants are entitled to summary judgment for these claims.

> B. CARTER FAILS TO ESTABLISH THAT MATHENA, KISER, NEWBERRY, OR WICKS WAS DELIBERATELY INDIFFERENT BY CREATING OR EXECUTING POLICIES THAT ALLOW ROUTINE CELL TRANSFERS ONLY ON THE FIRST DAY OF A MONTH AND DISALLOW AN INMATE MORE THAN ONE ROUTINE CELL-CHANGE REQUEST EVERY SIX MONTHS.

KMCC policy limits routine cell transfers to the first day of a month and does not allow an inmate more than one routine cell-change request every six months. Carter argues that this policy, which he believes Mathena, Kiser, Newberry, and Wicks created and execute, constitutes deliberate indifference to inmate safety. However, neither the challenged policies nor defendants' execution of them implicates the violation of a civil right.

Mathena explains that KMCC policy requires an inmate who has a documented enemy or a problem with another inmate in the same housing unit to contact the Building Sergeant, who notifies the Watch Commander.[16] The inmate should then receive an "Inmate Fear of Life or Safety Statement" form to assist KMCC staff's investigation of the inmate's claim. When an officer in charge determines that a potentially dangerous situation exists, the inmates should be immediately separated in different housing units or in segregation. (OP 830.6 at § IV(A)(2).) Absent a potentially dangerous situation, an inmate may request one transfer to another bed or

---

[16] While the KMCC policy directs an inmate to inform his Building Sergeant of an enemy situation, VDOC Operating Procedure ("OP") 830.6, "Offender Enemy Information Management," states, "A staff member who becomes aware of a possible need to separate offenders should immediately notify the Officer in Charge . . . or administrator on duty." (OP 830.6 (ECF no. 115-2) at § IV(A)(1).)

cell within a pod every six months, but inmates may not choose the bed assignment or another housing unit. Mathena explains that these restrictions prevent inmates from gathering by a gang or other affiliation and from disrupting KMCC's operations and security.

In light of these policies, Carter fails to establish that Mathena, Kiser, Newberry, or Wicks knew of and disregarded an excessive risk to Carter's safety by allowing only one routine cell-change request every six months and performing the changes on the first day of a month. No KMCC Building Sergeant ever notified a Watch Commander of Carter wanting a transfer for fear of Parker, Carter never completed an "Inmate Fear of Life or Safety Statement," and Davidson did not believe that a potentially dangerous situation existed because Carter wanted a transfer to a smoking pod. Thus, the general cell-change policy applied, and nothing about the general cell-change policy implicates an excessive risk to inmate safety. If Carter had completed an "Inmate Fear of Life or Safety Statement" and OP 830.6 or the KMCC policy required waiting until the first of the next month to be moved, then perhaps the policy could facilitate an excessive risk to inmate safety. Instead, Carter asked Sgt. Davidson for a routine transfer to smoke, and any delay in moving to a smoking pod does not implicate an excessive risk to his safety.

By requesting a transfer in order to smoke, Carter also cannot establish that Mathena, Kiser, Newberry, or Wicks had actual or constructive knowledge that a subordinate who waited until the first of a month to transfer Carter to a smoking pod was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury. Carter also does not establish that any affirmative causal link existed between Carter requesting a routine, non-emergency transfer to a smoking pod and Parker's attack. Therefore, the challenged cell-transfer policies are not a

result of deliberate indifference, and Mathena, Kiser, Newberry, and Wicks cannot be held liable as supervisors. See, e.g., Shaw, 13 F.3d at 799 (holding that supervisory liability requires a supervisor's actual or constructive knowledge of a pervasive and unreasonable risk of constitutional injury to people like the plaintiff); Slakan, 737 F.2d at 368 (requiring conduct that poses a widespread risk of constitutional injury to impose supervisory liability). Accordingly, these defendants are entitled to summary judgment for these claims.

C.   CARTER FAILS TO ESTABLISH THAT JOHNSON, MATHENA, KISER, NEWBERRY, OR WICKS WAS DELIBERATELY INDIFFERENT TO A SERIOUS RISK OF HARM ABOUT OVERCROWDED AND UNDERSTAFFED DINING HALLS.

Carter accuses Johnson, Mathena, Kiser, Newberry, and Wicks of being deliberately indifferent to the alleged serious risk that overcrowded and understaffed KMCC dining halls pose to inmate health. Carter alleges that Mathena, Kiser, Newberry, and Wicks know about overcrowded dining halls because they work at KMCC and because "several fights" occurred in "previous years[.]" Carter speculates that having only two correctional officers monitor approximately 150 inmates in a dining hall that seats 120 inmates cause "conditions that spark controversy and possible heated situations." (Am. Compl. ¶ 216.) Carter also concludes without support that Mathena, Kiser, Newberry, and Wicks failed to train and supervise unnamed subordinates who monitor KMCC dining halls.

Carter relatedly accuses Johnson of "probably [receiving] daily reports" about KMCC's overcrowded dining halls and "being fully aware" that the security cameras in the KMCC dining halls are "severely outdated and inadequate[.]" (Id. ¶¶ 210, 212.) Carter further accuses Johnson of being "patently aware of all safety/security problems . . . at [KMCC]" because these "security problems" were "obvious to any knowledgeable and competent observer." (Id. ¶ 209.)

12

Per KMCC policy, at least two security staff, one of which is a sergeant or higher, supervise each of KMCC's two dining halls during meals. One officer observes the serving line, a second officer roams the dining hall, and additional security personnel monitor each dining hall via security cameras. The supervising officers bring approximately 72 inmates from a pod to the a dining hall, which seats approximately 120 inmates, and allow inmates from the next pod to enter the dining hall as inmates from the prior pod finish eating and exit the dining hall. Newberry avers that, on rare occasions, the serving line can back up and a few inmates will stand with their trays waiting for seats to be available, but officers prevent inmates from proceeding down the serving line until dining seats are available. Inmates must be seated before eating and must leave the dining hall after finishing their meals.

Mathena reviewed institutional records that reveal no fights occurred in the dining halls in 2008 and only two fights occurred in 2009. Thus, no trier of fact could find that the current system of repeatedly feeding hundreds of inmates in the dining halls each day presents a serious risk to inmate health when two fights occur in two years. These defendants' knowledge of a general risk of inmate violence at the KMCC dining halls because of two fights in two years does not constitute deliberate indifference to a risk of inmate safety. See, e.g., James, 956 F.2d at 701. Nor can Carter rely on speculation and conclusions, like "possible heated situations" and "patently aware," to adequately state a claim. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Moreover, Carter may not rely on respondeat superior to impose supervisory liability in a § 1983 action. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978). Accordingly, Johnson, Mathena, Kiser, Newberry, and Wicks are entitled to summary judgment for these

13

claims because Carter fails to establish that the dining halls posed a serious risk to inmate safety or that these defendants were deliberately indifferent.

D.  DISPUTES OF MATERIAL FACTS EXIST WHETHER MITCHEM, HORN, DAVIDSON, AND HONAKER WERE DELIBERATELY INDIFFERENT TO THE RISK OF PARKER'S ATTACK.

Disputes of material facts exist about whether Mitchem, Horn, Davidson, and Honaker were deliberately indifferent to the substantial risk that Parker would cause Carter serious physical harm. Accordingly, Carter's and defendants' motions for summary judgment must be denied for these claims.

Mitchem, Horn, Davidson, and Honaker do not remember talking to Carter about Parker. Mitchem and Horn explain that they would have brought Carter to the watch office to obtain more information if Carter had told them he was afraid of Parker, and Honaker avers that he would have ordered Carter to either formally declare or deny being in fear for his life if Carter told him about his fear of Parker. Davidson avers that he would have given Carter a standard cell change request form if Carter said he wanted to transfer to a smoking pod and further avers that he would have separated Carter and Parker had Carter said he was in danger from Parker.

In contrast, Carter alleges he explained his fear of Parker to Mitchem, Horn, Davidson, and Honaker due to Parker's aggressive conversations and continual "gritting." KMCC inmate James Wallace describes how he also told Mitchem that Carter was in danger if he remained in C-3 and that Mitchem said there was nothing she could do because Carter had to tell "the proper people." Wallace also witnessed Carter beg Honaker and Horn to move him away from Parker, and William Julian, another KMCC inmate, avers he witnessed Carter ask Mitchem, Horn, and Honaker for protection from Parker. Although Carter admits to initially lying to Davidson about why he wanted a transfer, Carter explained to Davidson shortly thereafter why he was afraid of

14

Parker and needed a transfer to be kept safe. However, Davidson allegedly disregarded Carter's request merely as an attempt to quicken a transfer to a smoking pod.

These sworn statements create a genuine issue of disputed material fact as to whether Mitchem, Horn, Davidson, and Honaker knew and inferred the risk of Parker's attack. Assuming Carter's version of events is true, Mitchem, Horn, and Honaker were aware of the facts supporting Carter's fear of Parker and the unambiguous, direct inference that there was a substantial risk that Parker would assault Carter. Although Carter's initial lie to Davidson does not establish an unambiguous, direct inference that Carter was indeed in danger from Parker, Carter explained to Davidson that same day why he was afraid of Parker. Instead of doing anything to protect him, Mitchem and Horn said that Carter's fear of Parker was not their problem and told him to tell someone else; Davidson listened to Carter explain his fear of Parker and chose not to believe him; and Honaker never responded at all. Accordingly, a jury must resolve the disputes of material facts for these claims.[17] See Farmer, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."); Muhammad v. Johnson, No. 7:10-cv-00395, Report and Recommendation at 7 (W.D. Va. Dec. 20, 2011) (Ballou, Mag. J.) (recognizing a triable dispute of material fact existed for an Eighth Amendment failure-to-protect claim when the inmate told prison guards of a risk that a cellmate would harm him, the prison guards alleged the inmate said only that he and the cellmate did not get along,

---

[17] It is insignificant to the Eighth Amendment analysis that KMCC policy puts the burden on a KMCC inmate to tell the Building Sergeant of a problem with another inmate in the same pod. The Eighth Amendment requires all prison officials, not just an inmate's Building Sergeant, "to take reasonable measures to guarantee the safety of inmates. . . . [and] to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 832-33 (internal citations omitted). This duty is more accurately reflected in the VDOC's policy that puts the burden on any staff member "who becomes aware of a possible need to separate offenders" to immediately notify the officer in charge or administrator on duty, who then investigates the inmate's problem. (OP 830.6 at § IV(A).)

and the cellmate later inflicted serious physical harm), adopted, id., Order at 1 (W.D. Va. Jan. 26, 2012) (Wilson, J.).

E. GENUINE ISSUES OF DISPUTED MATERIAL FACTS ALSO PRECLUDE SUMMARY JUDGMENT AS TO WHETHER DEFENDANTS LOONEY AND BELCHER WERE DELIBERATELY INDIFFERENT TO PARKER'S ATTACK.

Carter also argues that Looney and Belcher were deliberately indifferent by not interrupting Parker's attack. The court is similarly unable to resolve disputes of material facts about Looney's and Belcher's actions after viewing facts and inferences from the required perspectives. Belcher avers seeing Parker's attack and responding by yelling at Parker to stop hitting Carter, but the inmate witnesses aver seeing Belcher retreat from the dining hall. The inference that Belcher left the dining hall to get help is contradicted by the fact that Looney avers he saw Belcher "ha[ve] his radio up and calling for help," although Belcher does not say whether he used, or even possessed, a radio.

Looney avers hearing a "loud thumping sound," walking toward the sound, and seeing Parker standing over Carter while Belcher used his radio to call for help. Looney allegedly yelled and approached closer to the fight, causing Parker to stand up and peacefully submit to handcuffs.[18] However, the inmate witnesses aver that Looney idly watched the fight without intervening or calling for help because Looney did not want to "put [him]self into something like that!" The inmates also aver that Parker only stopped beating Carter when Captain Wicks walked into the dining hall and told Parker to stop the attack, but Belcher avers that Parker stopped punching Carter once he and Looney arrived at the fight. Viewing the facts and inferences in a light more favorable to Carter, Belcher saw Parker hitting an inmate on the floor

---

[18] Looney does not explain what transpired between when he saw Parker standing and when Parker stood up after being yelled at, but ostensibly Parker knelt down on top of Carter and beat him.

16

and chose to leave the dining hall instead of intervening in the fight or calling for help on the radio, and Looney merely watched the fight until Parker voluntarily complied with Captain Wick's order.

Viewing the evidence at this point in the light most favorable to Carter, the court cannot conclude that no genuine issues of material fact exists as to whether Looney reasonably responded to preclude liability. Although Looney was left alone in the dining hall when Belcher retreated, nothing indicates that any inmate besides Parker was hostile or that any inmate posed a threat to him. According to Carter, Looney stood idly by while Parker pummeled him unconscious. There is nothing on the record at this point to support the inference that Looney risked physical injury by intervening. Compare Gordon, 574 F.2d at 1152 (holding a correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the Eighth Amendment), with Odom v. S.C. Dep't of Corr., 349 F.3d 765, 773 (4th Cir. 2003) ("[C]orrectional officers who are present when a violent altercation involving an armed inmate erupts and fail to intervene immediately do not violate the Eighth Amendment if the officers are unarmed, unaware of a risk of harm prior to the altercation, and take reasonable steps to intervene safely."). Furthermore, at this stage, there is nothing on the record to support an inference adverse to Carter that the fight was so quick that Looney or Belcher was unable to intervene. None of the parties or witnesses describes how long Parker beat Carter while Carter lay helplessly on the floor, and the fact that Belcher saw Parker punch Carter three times after the fight already started does not limit the attack to the time it took Parker to punch Carter three times. In short, genuine issues of disputed material fact exist as to whether the conduct of Belcher and Looney in the dining hall violated the Eighth Amendment.

17

See Farmer, 511 U.S. at 833 ("Gratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.") (internal quotation marks, alteration and citation omitted).

F.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT FOR CARTER'S FRIVOLOUS CLAIMS.

Carter presents several legally frivolous claims. See Neitzke v. Williams, 490 U.S. 319, 327 (1989) (noting frivolous claims are based upon an indisputably meritless legal theory, an infringement of a legal interest which clearly does not exist, or factual contentions that are clearly baseless). Newberry was allegedly deliberately indifferent by asking Carter, "What do you want?" and, "What's it gonna [sic] take?" during Newberry's investigation of Carter's grievances. Belcher was allegedly deliberately indifferent for jokes about Carter's injuries, which caused mental anguish and emotional distress. Horn was allegedly deliberately indifferent by lying to him about how Looney and Belcher reacted in the dining hall, which frustrated Carter's grievance remedies.

Newberry's questions, Belcher's jokes, and Horn's statements, even if true, do not implicate a violation of the Eighth or Fourteenth Amendment. Carter does not have a constitutional right to access a grievance system. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). A prison official's verbal harassment, even to an extent that it causes an inmate fear or emotional anxiety, also does not constitute a violation of a civil right. See, e.g., Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir. 1989).

Carter also alleges that Looney retaliated against him, causing mental anguish and emotional distress, in May 2009 when they spoke in segregation.[19] Looney told Carter that he

---

[19] Carter was in pre-hearing segregation until KMCC staff determined whether he committed an institutional infraction that is not related to this action.

18

did not know why Carter was in segregation but "could tell [Carter] how to avoid any more time there. . . . sa[ying], 'I'd drop it if I were you.  If you don't, this could go on forever.'"  (Am. Compl. ¶ 194.)  Looney reviewed Carter's institutional charge paperwork, explained errors and inconsistencies that could work in Carter's favor, and remarked, "I did you a favor, now do me one, please."  (Id. ¶ 195.)  Although Carter did not see Looney again after this conversation, Carter believes Looney was threatening him for filing grievances and this civil rights action.  (Id. ¶¶ 195, 228.)  However, it is factually impossible for any prison official to "pressure" Carter in May 2009 to "withdraw" this civil action before it was filed in September 2010.  Furthermore, Carter does not have a constitutional right to access a grievance system, and he cannot rely on conclusory allegations of retaliation.[20]  See Adams, 40 F.3d at 74, 75 (requiring a retaliation claim to show that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right).

Moreover, Carter fails to state a claim to the extent he alleges that a defendant violated the Eighth Amendment and Fourteenth Amendment for a negligent act or omission.  Whitley v. Albers, 475 U.S. 312, 319-30 (1986); Davidson v. Cannon, 474 U.S. 344, 347 (1986).  Carter also cannot recover against a defendant on the basis of respondeat superior.  Monell, 436 U.S. at 663 n.7.  Carter's mere invocation of the Fourteenth Amendment's equal protection clause without discussing the elements also does not entitle him to any relief.  Twombly, 550 U.S. at 555.  Accordingly, defendants are entitled to summary judgment for these claims.

**III.**

---

[20] Even if he had stated a claim, Carter cannot recover damages for only emotional anguish and distress without an accompanying, related physical injury.  42 U.S.C. § 1997e(e).

For the foregoing reasons, the court denies Carter's motion for summary judgment and denies in part defendants' motion for summary for the Eighth Amendment claims against defendants Mitchem, Horn, Davidson, Honaker, Looney, and Belcher about the events before and during the attack on March 9, 2009. The court grants defendants' motion for summary judgment for all other claims.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

Entered: March 11, 2013

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge